*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0349p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

            *Plaintiff-Appellee*,

     *v.*

JUAN DE OLEO,

            *Defendant-Appellant.*

No. 11-1360

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:09-cr-20221-8—Denise Page Hood, District Judge.

Decided and Filed:  September 20, 2012[*]

Before:  COLE and KETHLEDGE, Circuit Judges; THAPAR, District Judge.[**]

_____

## COUNSEL

**ON BRIEF:** Arthur Joel Berger, Coral Gables, Florida, Peter S. Heller, COCHRAN FIRM, Miami, Florida, for Appellant.  Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

AMUL R. THAPAR, District Judge.  Juan De Oleo appeals his conviction for Medicare fraud, conspiracy to commit Medicare fraud, and money laundering.  We affirm.

---

[*] This deciscion was originally issued as an "unpublished decision" filed on September 20, 2012. The court has now designated the opinion as one recommended for full-text publication.

[**] The Honorable Amul R. Thapar, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

**I.**

De Oleo and his co-conspirators engaged in a lucrative form of Medicare fraud. They created sham medical clinics by renting office space, furnishing it with enough equipment to make the clinic appear legitimate, and hiring a doctor willing to participate in the fraud. After that, they bribed Medicare beneficiaries to travel to the fraudulent clinic and submit their insurance information without receiving treatment. To make the scheme profitable, the conspirators used that insurance information to bill Medicare for expensive medications.

De Oleo got his start with fraudulent clinics down in Florida. There, he worked as a medical assistant at a clinic owned by Jose Rosario. After the government cracked down on fraud in Florida, De Oleo and his co-conspirators, including his wife Rosa Genao, moved their conspiracy to Michigan. While in Michigan, De Oleo partnered with Rosario to open Xpress Medical Center.

A few weeks after Xpress began submitting its fraudulent bills to Medicare, Medicare began investigating the clinic. That investigation led to the indictment of Rosario, De Oleo, Genao, and a number of their co-conspirators. Many defendants pled guilty. But De Oleo, Genao, and medical assistant Deirdre Teagan proceeded to trial. The jury ultimately convicted De Oleo and Genao and acquitted Teagan of all but one count.

This appeal followed.

**II.**

De Oleo faults the district judge for two discretionary decisions: first, her dismissal of a juror after the close of evidence, and, second, her admission of evidence about De Oleo's and the witnesses' involvement in other fraudulent clinics.

## A. Excuse of Juror 12

Juror 12 was a full-time student at Adrian College. During jury selection, she informed the court that she did not want to miss the beginning of school. The district judge believed the trial would be finished before classes began. During trial, however, the district judge realized that trial would go longer than expected. Juror 12 immediately reiterated her desire not to miss classes. The court assured her that she would not have to miss school, and no one objected. At the close of evidence, it became clear that Juror 12 would likely miss the start of college classes if required to deliberate with the jury. As promised, the court excused her and replaced her with an alternate. De Oleo objected. He did not explain the grounds for his objection except to state that it was important to his client that Juror 12 not be dismissed.

The district court's dismissal of Juror 12 was reasonable. A district court may replace a juror with an alternate when a juror is either "unable or disqualified to perform juror duties." Fed. R. Crim. Proc. 24(c)(1). The consent of the parties is not needed if the district court has "reasonable cause" to replace the juror. *United States v. Cantu*, 229 F.3d 544, 550 (6th Cir. 2000); *United States v. Warren*, 973 F.2d 1304, 1308 (6th Cir. 1992). We review the district court's decision for an abuse of discretion. *Cantu*, 229 F.3d at 550.

De Oleo believes that Juror 12's academic obligations were insufficiently serious to rise to the level of reasonable cause. But even if De Oleo's contention that "next to nothing is done the first week of college classes" is true (and we are sure that academics nationwide would disagree, *see e.g., The Paper Chase* (Twentieth Century Fox, 1973) (Hart's first day in Kingsfield's class)), his observation misses the point. In many cases, it is not the conflict's objective seriousness but its impact on a particular juror that matters. Jurors, like all people, "boil at different degrees." Ralph Waldo Emerson, 7 *The Complete Works of Ralph Waldo Emerson* 61 (Houghton, Mifflin, and Company 1904) (1870). A conflict that one juror might brush aside might render another unable to give a case due consideration. The district judge might believe that one juror can leave a family conflict at the courthouse door, while another might be so "affected by

the quarrel with her husband [] that her ability to shoulder her responsibilities as a member of the jury [is] impaired." *United States v. Brown*, 571 F.2d 980, 985 (6th Cir. 1978).  One juror might put jury service before family obligations, while another might grow "impatient and disgruntled" when sitting on a lengthy trial while her niece is visiting.  *United States v. Shelton*, 669 F.2d 446, 460 (7th Cir. 1982).  Good cause may encompass any of "the inevitable vagaries of the many trial participants' complex lives." *United States v. Nelson*, 102 F.3d 1344, 1350 (4th Cir. 1996).  These vagaries include a state court appearance, *United States v. Warren*, 973 F.2d 1304, 1308–09 (6th Cir. 1992); difficulty concentrating due to deaths in the juror's family, *United States v. Virgen-Moreno*, 265 F.3d 276, 287–88 (5th Cir. 2001); holiday travel plans, *Nelson*, 102 F.3d at 1349–50; and taking a child to college, *United States v. McMillan*, 64 F.3d 660, at *2 (4th Cir. 1995) (unpublished).  Of course, the district judge must balance any particular vagary against the preference for maintaining the originally selected jury.  *See Nelson*, 102 F.3d at 1350.

Ultimately, district judges are in the best position to view a juror's demeanor and determine whether she is able to shoulder the obligations of jury service.  Here, Juror 12 repeatedly raised her academic obligations with the court.  The district court apparently concluded from these statements that missing class would distract Juror 12 from giving her full attention to the deliberations.  Thus, the court's determination to excuse Juror 12 was reasonable.

The court also made clear at the outset that it viewed a school conflict as legitimate and would excuse the juror if the trial ultimately conflicted with the start of classes.  Neither party objected to Juror 12 when she was added to the jury under those conditions.  Moreover, De Oleo has failed to show that he was prejudiced by the substitution.  *See United States v. Powell*, 15 F. App'x 337, 339 (6th Cir. 2001) ("A defendant claiming to be injured by the replacement of a juror is entitled to a new trial only upon a clear showing of prejudice" (citing *United States v. Warren*, 973 F.2d 1304, 1308 (6th Cir.1992))).  The court did not abuse its discretion by excluding Juror 12.

**B.    Other Acts Evidence**

During trial, the government introduced evidence regarding other fraudulent clinics established in Florida and Michigan.  De Oleo asserts that this information was irrelevant because he did not commit crimes at these clinics, and that the trial court improperly admitted such evidence under Federal Rule of Evidence 404(b).  Whether De Oleo's relevance objection is preserved is unclear, but in any case the information was relevant to explain the witnesses' involvement in the broader fraudulent clinic scheme and their subsequent knowledge of or involvement in the Xpress clinic.  *See, e.g.*, Transcript of Jury Trial, *United States v. Briceno et al.*, No. 09-cr-20221-DPH (E.D. Mich. Aug. 21, 2011), R. 264 at 15–17; *id.* at R. 274 at 45–47.

De Oleo *was* involved in some of these previous clinics, and as to those clinics the district court properly ruled that this evidence was admissible under Rule 404(b). The court permitted the government to use the evidence to demonstrate De Oleo's intent, knowledge, or plan to commit Medicare fraud at the Xpress clinic.  While we normally review evidentiary issues for abuse of discretion, *General Elec. Co. v. Joiner*, 522 U.S. 136, 141–42 (1997), there is an intra-circuit conflict over how best to review Rule 404(b) evidence.  *See United States v. Clay,* 667 F.3d 689, 703 (6th Cir. 2012) (Kethledge, J., dissenting) (noting the intra-circuit split).  But De Oleo loses under even de novo review.

In evaluating Rule 404(b) evidence, courts employ a three-step process by reviewing: (1) whether the other acts actually occurred, (2) whether they "were admissible for a permissible [Rule] 404(b) purpose," and (3) whether the district court correctly determined that the acts' probative value was not substantially outweighed by the danger of unfair prejudice.  *Clay,* 667 F.3d at 693; *United States v. James*, No. 11-3711, 2012 WL 3608612, at *5 (6th Cir. Aug. 23, 2012).

*The Other Acts Actually Occurred*: De Oleo does not contest that the other acts actually occurred.  *See* Appellant's Br. and Reply.

*Proper Purpose***:** The district court properly determined that the other clinics were relevant to De Oleo's knowledge, intent, or plan.

Sacred Heart: Sacred Heart was a fraudulent medical clinic that Rosario operated in Florida. De Oleo was the medical assistant there, so his involvement in this clinic is relevant to his knowledge of Rosario's fraudulent clinic scheme and his knowledge of how these clinics defrauded Medicare. *See* Transcript of Jury Trial, *Briceno et al.*, No. 09-cr-20221-DPH, R. 263 at 50.

Lifetime Medical Center: De Oleo introduced Genao to Rosario, and this meeting spawned Lifetime Medical Center. *Id.* at 52. Thus, evidence of this clinic can be introduced to show De Oleo had knowledge of Rosario's fraudulent clinic scheme and intended to participate in it. Lifetime also used Genao to fabricate patients' medical charts in a similar manner as Xpress, *id.* at 46, 52, so this evidence was also probative of Xpress and De Oleo's plan to defraud Medicare.

Sacred Hope: De Oleo's visit to Sacred Hope and examination of Sacred Hope's patient files demonstrates his knowledge of the way that Rosario's Michigan clinics operated and his intent to run the Xpress clinic in a similar manner. *Id.* at R. 279 at 186-90.

De Oleo contends that the United States offered the other acts evidence before he put his knowledge of the illegal activities at the Xpress clinic at issue. Reply at 13. De Oleo is mistaken. The district court asked De Oleo before trial if he would be disputing knowledge and intent, and he said that, "for now, the answer is yes." Transcript of Jury Trial, *Briceno et al.*, No. 09-cr-20221-DPH, R. 262 at 19–23. And De Oleo's counsel argued in his opening statement that De Oleo was just an "acquaintance" of Rosario. *Id.* at R. 273 at 63–64. Even without these statements, it is clear that De Oleo's knowledge of Xpress's fraudulent activities and his intent to participate in them was, as they say, the whole ballgame. *See also id.* at R. 262 at 23 (United States' statement that what De Oleo knew is "ultimately going to be the issue in this case"); *United States v. Johnson,* 27 F.3d 1186, 1192 (6th Cir. 1994) (explaining that "where there is thrust upon the government, [] by virtue of the defense raised . . ., the affirmative duty to prove that the underlying prohibited act was done with a specific criminal intent, other acts evidence may be introduced under Rule 404(b)").

*Rule 403 Balancing***:** The evidence of De Oleo's involvement in other fraudulent clinics was more probative than prejudicial.  As the district court noted in denying De Oleo's motion for a new trial, the admission of testimony about the other clinics "was crafted so as not to overly prejudice De Oleo and Genao." *United States v. De Oleo*, No. 09-20221, 2011 WL 836737, at \*2 (E.D. Mich. Mar. 9, 2011).  The court also gave a limiting instruction, cautioning the jury to consider the other clinics only for the limited purpose of assessing De Oleo's intent, knowledge, and plan.  Transcript of Jury Trial, *Briceno et al.*, No. 09-cr-20221-DPH, R. 273 at 24.  Limiting instructions are one factor that the district court can consider in conducting a 403 balancing test for other acts evidence.  *See, e.g.*, *United States v. Hardy*, 643 F.3d 143, 153 (6th Cir. 2011).  These instructions were sufficient to prevent unfair prejudice to De Oleo.

Additionally, the evidence of other fraudulent clinics in Florida and Michigan, if not admissible under 404(b), would likely be admissible as background evidence. Background evidence is a narrow category of evidence that typically provides context for the jury, either because it is directly probative, acts as a prelude to the offense or arises from the same events, forms an integral part of a witness's testimony, or completes the story of the offense. *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011) (admitting evidence under Rule 404(b) that "completes the story of[] the charged offense"); *see also United States v. Lamar*, 466 F. App'x 495, 499 (6th Cir. 2012).  Here, when reviewed for abuse of discretion, *see Clay,* 667 F.3d at 697–98, the other clinics evidence was an integral part of the various witnesses' testimony.  For example, the testimony explained how De Oleo and Rosario met (Sacred Heart), how De Oleo introduced Genao to Rosario (Lifetime), why Rosario moved to Michigan (Dearborn), and showed that De Oleo knew about Rosario's scheme to open fraudulent clinics in Michigan (Sacred Hope).  Transcript of Jury Trial, *Briceno et al.*, No. 09-cr-20221-DPH, at R. 263 at 50–61, *Id.* at R. 279 at 186–90.  And Rosario testified about his involvement in the other clinics as part of telling the story about how he and his co-conspirators moved from Florida to Michigan.

Moreover, any error here was harmless.   There was ample evidence to support De Oleo's conviction, and we can say with "fair assurance" that the jury's verdict "was not substantially swayed" by the evidence of the other fraudulent clinics.  *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

De Oleo's conviction and sentence are affirmed.