**UNITED STATES of America,**
**Plaintiff,**

v.

**Alexandra NORWOOD,**
**et al., Defendants.**

**Case No. 12-CR-20287**

United States District Court,
E.D. Michigan, Southern Division.

Signed 07/18/2014

Anthony P. Vance, Craig F. Wininger, United States Attorney's Office, Flint, MI, for Plaintiff.

Harold Z. Gurewitz, Gurewitz & Raben, PLC, Henry M. Scharg, William W. Swor, Richard D. Korn, Detroit, MI, John R. Minock, Cramer, Minock & Sweeney, P.L.C., Randall C. Roberts, Ann Arbor, MI, Joan Morgan, Federal Defender Office, Glenn M. Simmington, Law Office of Glenn M. Simmington, Charles A. Grossmann, Flint, MI, Judith S. Gracey, The Gracey Law Firm, Farmington Hills, MI, Malcolm J. Evans, Sandstone, MN, Mark A. Gatesman, Mark Gatesman Attorney at Law, Howell, MI, for Defendants.

## OPINION AND ORDER DISMISSING JUROR 7

MARK A. GOLDSMITH, United States District Judge

Trial commenced in this matter on May 27, 2014. On June 25, 2014, the Court learned that a Government witness believed that she recognized the juror seated in seat 7 (hereinafter "Juror 7"), and that Juror 7 could possibly be related to homicide victim Marion Hardy. See Am. First Superseding Indictment at 18, 23 (Dkt. 191). Upon receiving this report, the Court held two in-camera sessions, requested memoranda from the parties, and examined Juror 7. In examining Juror 7, the Court discovered that Juror 7 had been dishonest in her juror questionnaire and in voir dire during jury selection. The Government took the position that reasonable cause supported the dismissal of Juror 7 and the replacement of her with an alternate. Defendants argued that Juror 7 should not be dismissed because Juror 7's responses did not indicate that she was biased. Upon due consideration of the parties' arguments and the relevant law, the Court concludes that reasonable cause exists to dismiss Juror 7 pursuant to Federal Rule of Criminal Procedure 24(c) and replaces her with Juror 15, a previously designated alternate.

On June 24, 2014, the aunt of homicide victim Marion Hardy, who testified previously in this case on June 23, 2014, contacted the Government. Gov't Supp. Mem. at 1. The aunt informed the Government that she recognized Juror 7 and stated that she may be related to Juror 7. The aunt also divulged that she believed that Juror 7's mother had been incarcerated for murder. Id. The Government informed the Court and defense counsel of this development the following day, June 25, 2014.

In an in-camera proceeding to discuss Juror 7 on June 27, 2014, the Court learned of information that corroborated the aunt's claim that Juror 7's mother had been incarcerated on a murder conviction. Defense counsel directed the Court to People v. Campbell, No. 187457, 1997 WL 33354573 (Mich.Ct.App. Jan. 14, 1997). 6/27/14 Tr. at 23. In Campbell, the Michigan Court of Appeals reversed the Genesee Circuit Court's grant of Ernestine Campbell's motion for relief from judgment for her murder conviction. Id. at * 1. The conviction arose from Campbell's role in the homicide of James Oldacre in Flint in 1966. Id. On December 12, 1966, Campbell, then working as a prostitute, got into dispute with Oldacre, one of her clients. Id. The dispute escalated and resulted in Campbell's boyfriend, Harold Nunn, and her friend, James Henagen, fighting with Oldacre. Id. After Henagen stabbed Oldacre to death, Campbell rifled through Oldacre's pockets and took a large amount of money. Id. In 1967, the three were jointly tried by a jury, convicted of felony murder, and sentenced to life imprisonment without

possibility of parole. Id. [1]

In addition, defense counsel informed the Court about a news article from 15 years earlier, which detailed the murder conviction and familial relations of Juror 7's mother. 6/27/14 Tr. at 24. [2] The article provided background regarding Campbell's conviction and revealed that Campbell gave birth to a girl during her murder trial, and that Nunn, her boyfriend and codefendant, was the father of the child. Desiree Cooper, Waiting for Justice, MetroTimes, Jan. 20, 1999, available at http://www2.metrotimes.com/news/story.asp?id= 10721 (last visited July 17, 2014). The article stated Campbell's mother raised the child, in addition to Campbell's three other children. Id. Additionally, the article mentioned that Campbell's mother would take the children to see their mother in jail and that Juror 7's brother had spent time in jail on a drug charge. Id.

These revelations raised concerns about Juror 7's responses to the 99-question confidential questionnaire completed by all potential jurors prior to trial. See Ex. A to 3/10/14 Order (Dkt. 393). When the potential jurors were summoned to the Court to complete the questionnaire, the Court instructed the potential jurors that they had to "make sure" that they "answer[ed] the questions truthfully and completely." 3/27/14 Tr. at 3. Furthermore, the potential jurors swore an oath to "give truthful answers to the questions set forth in the questionnaire." Id. at 3-4. Approximately two months after completion of the questionnaires, the potential jurors appeared for voir dire. On May 29, 2014, Juror 7 was examined during jury selection. In response to a question by the Court whether Juror 7 had any changes to her questionnaire, Juror 7 stated that she had no changes. 5/29/14 Tr. at 113.

Question 42 of the questionnaire had asked whether the potential juror, or any member of the potential juror's family or close friend had "ever been questioned about, accused of, investigated for, arrested for or charged with a crime (other than a minor traffic offense)?" Id. at 7-8. Juror 7 checked "No" in response to this question and did not complete the sub-sections of the question. Furthermore, question 78 of the questionnaire asked whether the potential juror or anyone close to the potential juror had "ever been involved with gangs, drug sales, or illegal weapons sales." Id. at 16. Juror 7 made no mention of her brother, but instead responded, "Yes friends were convicted from the 1980s."

As a result of the potential inconsistencies between Juror 7's questionnaire responses and the information contained in Campbell and the news article, the Court requested that the parties submit memoranda under seal on the standard for juror removal. 6/27/14 Tr. at 35-38.

---

1. In 1990, Michigan Governor James Blanchard commuted the sentences of Nunn and Henagen, but not Campbell, apparently because Campbell was unaware of the possibility of having her sentence commuted. Campbell, 1997 WL 33354573, at *1. In denying Campbell relief on appeal, the Michigan Court of Appeals was "troubled" because Nunn and Henagen had their sentences commuted and were subsequently released from prison. Id. at *3. The court noted that, even though Campbell was "clearly the least culpable of the three concerning the actual murder, only [Campbell] remain[ed] imprisoned." Id. The court then advised Campbell that she could request the governor to exercise his power of commutation under the Michigan Constitution and use its opinion to apply for "a reprieve, commutation, or pardon." Id.

2. As of the date of this Opinion and Order, no party has ordered final transcripts for the proceedings held on 3/27/14, 5/29/14, 6/27/14, and 6/30/14. Therefore, the Court cites to the rough transcripts.

After timely submission of memoranda under seal, the Court conducted voir dire of Juror 7 in chambers on June 30, 2014. The Court asked Juror 7 if she had any relatives that had been in trouble with the law. Juror 7 responded, "Of course." 6/30/14 Tr. at 58. Juror 7 stated that both her father and mother served time in prison for killing a man. Id. Juror 7 also testified that her brother went to prison as well. Id. at 59. Juror 7 stated that her brother was with some guys from Detroit and that he was present "when someone had gotten killed." Id. Juror 7 recalled the name of her brother's defense attorney at the time. Id.

Upon questions from the Court, Juror 7 discussed her family background and relationship with her mother, father, and brother. Juror 7 stated that she was raised by her grandparents. Id. at 58-59. She indicated that she visited her mother in prison until she was approximately 16 or 17 years old. Id. at 64. When her mother was released in 2001, she said she stayed with her for several days and would then fly home and see her once a week for several months until she passed away. Id. at 63. Juror 7 stated that she developed a relationship with her dad when he was released from prison. Juror 7 estimated seeing her father approximately 10 times since 2007, noting that he had been in and out of prison following the commutation of his sentence in the murder case in 1991. Id. at 65-66. Juror 7 also stated that she sees her brother every day and that he's turned his life around. Id. at 67-68.

When asked how she responded to Question 42 on the juror questionnaire, Juror 7 believed that she had "probably" answered "yes." Id. at 60. Juror 7 further explained that she "was just trying to get out the door," referring to the March 27, 2014 assembly of the venire to complete the questionnaire. Id. at 60; see 2/7/14 Order ¶ 2(Dkt. 357). The Court then informed Juror 7 that in fact, she had answered "no" to Question 42. 6/30/14 Tr. at 61. In response, Juror 7 reiterated that she was "just trying to get out the door" and leave. Id. She also made reference to the length of the questionnaire and that she completed the questionnaire in haste. Id. at 68-69. Juror 7 stated that, although she has close relatives who have been convicted of crimes, this would not affect her decision-making in this matter; she believed that she could be fair and impartial.[3] Id. 69-70.

The Court also inquired if Juror 7 recognized any of the witnesses or names of victims. Juror 7 stated that she recognized Officer Scott Watson. Id. at 70. She said she recently saw him at a restaurant. Juror 7 also stated that she recognized Fred Bashir, father of homicide victim Omar Bashir, see Third Am. Notice at 2 (Dkt. 544), because Juror 7 organizes an annual tailgate for her high school and had spoken to Mr. Bashir in the context of his employment with the local school board. 6/30/14 Tr. at 71-72. Moreover, Juror 7 indicated that she recognized some women in the gallery from the annual tailgate and one from a bar she frequents. Id. at 74-75. Juror 7 reiterated that she could be fair

---

**3.** After voir dire, the Government represents that it conducted additional research into Juror 7's brother and found that the brother was arrested and charged in 1989 with homicide-open murder. Gov't Supp. Mem. at 6. Juror 7's brother eventually pled guilty to a reduced charge of assault with a dangerous weapon and was sentenced to two-to-four years' imprisonment. Id. Juror 7's brother also had three felony drug-related convictions from the 1990s in Genesee County Circuit Court, including a 1997 conviction for delivery/manufacture marijuana. Id. at 6-7. Records also indicate the Juror 7's brother was convicted of resisting arrest in Virginia Beach in 1987. Id. at 6.

and impartial despite recognizing these people. Id. at 76-77. Juror 7 made no mention of recognizing or being related to Marion Hardy or his aunt.

After the voir dire of Juror 7, the Court inquired whether the parties had positions regarding Juror 7's fitness for continued jury service. The Government requested that Juror 7 be removed. Id. at 81. Defendants took the position that Juror 7 should not be removed, arguing that Juror 7 did not consider her biological parents to be her mother or father.[4] Id. at 82-84. After the hearing, the Government submitted supplemental memoranda, arguing that Juror 7 was dishonest and deprived the parties of meaningful voir dire. See, e.g., Gov't Supp. Br. at 8. No Defendant submitted a supplemental filing after the hearing to set forth their reasons to keep Juror 7 on the jury.

■■■ Having considered the parties' positions and the relevant law, the Court dismisses Juror 7, and replaces her with Juror 15, an alternate, pursuant to Federal Rule of Criminal Procedure 24(c). Rule 24(c) provides that a court may "replace any jurors who are unable to perform or who are disqualified from performing their duties" with an alternate juror. Fed. R. Cr. P. 24(c). To exercise its discretion pursuant to Rule 24(c) in dismissing a juror and seating an alternate, a trial court needs "reasonable cause." United States v. Warren, 973 F.2d 1304, 1308–1309 (6th Cir. 1992). If reasonable cause exists, substitution "is within the prerogatives of the trial court and does not require the consent of any party." Id. Such prerogatives are entrusted to the trial court because such courts "are in the best position to view a

juror's demeanor and determine whether she is able to shoulder the obligations of jury service." United States v. De Oleo, 697 F.3d 338, 342 (6th Cir.2012).

Reasonable cause arises in a variety of contexts because of "the inevitable vagaries of the many trial participants' complex lives." Id. (collecting cases and concluding that reasonable cause existed to replace juror who had academic obligations which may have distracted juror from deliberations); see also United States v. Daniels, 528 F.2d 705, 709–710 (6th Cir.1975) (replacing juror who had inadvertently failed to disclose during voir dire, in response to a question whether any family members had been a crime victim, that her husband had been robbed); United States v. Cantu, 229 F.3d 544, 550 (6th Cir.2000) (reasonable cause supported replacing juror who might not have been qualified to be a juror due to the unclear status of juror's previous conviction and the possibility that juror's concern about his own situation might affect his ability to be fair and impartial); Warren, 973 F.2d at 1308–1309 (reasonable cause justified replacing juror who had to appear in state court to answer unspecified charges); United States v. Berrios–Rodriguez, 768 F.Supp. 941, 942 (D.P.R.1991) (dismissing untruthful juror who lied about his drug use during voir dire).

■■■ Upon finding reasonable cause to excuse a juror, the juror should be removed prior to the jury beginning deliberations. United States v. Gabrion, 648 F.3d 307, 338–339 (6th Cir.2011) (replacing juror, who had been found sleeping by the court during trial at various times, with alternate just before jury began delibera-

---

4. The attorneys for Jonathan Walker and Jatimothy Walker initially agreed with the Government that Juror 7 should be removed because of her dishonesty. 6/30/14 Tr. at 78-81. Upon the request of other defense attorneys, however, the Court recessed so that the attorneys could consult with their clients. Id. at 81. When the Court resumed the proceedings, all the defense attorneys stated that they opposed the removal of Juror 7. Id. at 82.

tions) rev'd en banc on other grounds by 719 F.3d 511 (6th Cir.2013). As the Sixth Circuit has explained, Rule 24 allows a trial court to take action before a verdict is rendered "to obviate the need to grant a new trial at a later stage of the proceedings and thus furthers the goal of ensuring a fair trial and contributes to the efficient use of judicial resources." Cantu, 229 F.3d at 550.[5]

Here, the Court finds that Juror 7 was dishonest in her responses to questions 42 and 78 when she stated that she had no relatives who had faced a criminal prosecution. By contrast, in response to the Court's questioning on June 30, 2014, Juror 7 acknowledged how her mother and father were convicted of murder during voir dire on June 30, 2014—information glaringly omitted from her questionnaire responses. Juror 7 also acknowledged her brother's convictions—criminal matters she inexplicably did not mention in her questionnaire responses.

The Court does not find credible Juror 7's explanation for her failure to answer the questions truthfully. Although she mentioned that she was raised by her grandparents, Juror 7 certainly understood that her biological parents were considered her "family" within the meaning of question 42 because she quickly answered the Court's question regarding family members who had been in trouble with the law by disclosing her parents' murder convictions. Further, her statement that she was "just trying to get out there"—meaning that she was not paying particular attention to the framing of her answers— is belied by her more detailed (but incomplete) answer to question 78, where she noted convictions of her friends from the 1980s, but omitted any mention of her brother's numerous felony convictions.

Even if Juror 7 had felt rushed when she completed her questionnaire in March, before trial began, this would not explain why she failed to correct her omissions during voir dire in May. Every potential juror was examined by the Court, as well as counsel. The Court asked every juror whether there were any changes to their questionnaire answers. Several jurors advised the Court of changes, with some asking for a sidebar to avoid embarrassment or to protect their privacy. Juror 7 did not.

---

5. Notably, Defendants take the position that the Court has discretion under Rule 24(c), and that exercise of that discretion in removing a juror is only warranted if the Court were to conclude that there was a misstatement by a juror that would have led to a successful challenge for cause. 6/30/14 Tr. at 30; see also Def. Mem. at 2-4 (citing McDonough Power Equip. Inc. v. Greenwood, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984)) and Zerka v. Green, 49 F.3d 1181 (6th Cir.1995). However, the Sixth Circuit has explicitly rejected the approach urged by Defendants in Cantu, where a defendant appealed the district court's dismissal of a juror and replacement of the juror with an alternate prior to the jury reaching a verdict. The defendant argued that the juror's answers in voir dire did not establish that he was disqualified, and that the district court erred because it did not determine that the juror was biased before replacing the juror. Cantu, 229 F.3d at 549. In rejecting the defendant's argument, the Sixth Circuit stated that the defendant's authority was inapposite, noting that Greenwood and Zerka are cases where "a losing party was seeking a new trial on the ground that one of the jurors either deliberately or inadvertently failed to reveal information during voir dire that might have indicated bias." Id. The Sixth Circuit distinguished Greenwood and Zerka from Cantu on the grounds that the former cases "involve[d] a motion for a new trial after a verdict was rendered." Id. at 550. Because no verdict had been rendered, the court held that a juror could be replaced pursuant to Rule 24(c) for reasonable cause. Id. (citing Warren, 973 F.2d at 1308–1309).

Juror 7's motive for failing to be honest is not entirely clear. For present purposes, it is sufficient that Juror 7 has demonstrated a conscious unwillingness to follow the Court's instruction to complete the questionnaire truthfully. Further, she had taken an oath to answer the questions truthfully, and she violated her oath, as well. Because of her untruthfulness, she does not possess the necessary qualification to act responsibly as a juror. The Court concludes that reasonable cause exists to dismiss Juror 7, as she is disqualified from performing her duties. Gabrion, 648 F.3d at 338; see also Daniels, 528 F.2d at 709–710 (approving dismissal of juror for unintentional voir dire omissions); Berrios–Rodriguez, 768 F.Supp. at 942 (approving dismissal for intentional voir dire omissions).

Accordingly, the Court dismisses Juror 7 and replaces her with Juror 15.

SO ORDERED.