RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0089p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

GLENN ENGLISH (12-1255); RICHARD HOGAN (14-1498),

*Defendants-Appellants.*

Nos. 14-1255/1498

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cr-20269—Victoria A. Roberts, District Judge.

Decided and Filed: May 4, 2015[*]

Before: CLAY, KETHLEDGE, and DONALD, Circuit Judges

---

**COUNSEL**

**ON BRIEF:** Douglas R. Mullkoff, Ann Arbor, Michigan, for Appellant in 14-1255. Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant in 14-1498. Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

KETHLEDGE, J., delivered the opinion of the court in which DONALD, J., joined, and CLAY, J., joined in the result. CLAY, J. (pp. 7–9), delivered a separate concurring opinion.

---

[*]This decision was originally issued as an "unpublished decision" filed on May 4, 2015. The court has now designated the opinion as one recommended for full-text publication.

1

_____

**OPINION**

_____

KETHLEDGE, Circuit Judge.  A jury convicted Glenn English of Medicare fraud, and convicted both English and his associate, Richard Hogan, of conspiracy to commit Medicare fraud.  On appeal, English argues that the district court erred by allowing the government to admit evidence that he had been involved in two prior Medicare-fraud schemes.  Hogan argues that insufficient evidence supported his conviction, and that the district court erred by admitting two hearsay statements.  We affirm.

I.

When patients arrived at New Century—a medical clinic in Flint, Michigan—they would hand over their Medicare information at the front desk, meet with a doctor, and receive prescriptions for drugs, including Vicodin, Xanax, and Codeine.  A local pharmacy would fill the prescriptions, and a courier would deliver the drugs to the clinic in bulk.  While patients waited for their pills, they would hang out at the clinic, watching television, doing arts and crafts, and playing pool.

In exchange for the drugs, the patients would falsely state that they had received psychotherapy sessions at the clinic.  Patients would do so by signing their names in a binder, which the clinic staff nicknamed "the Bible."  Much like the actual Bible, the binder was full of prophecy: patients would state therein that they had received treatment on days that had not yet come to pass, often months in the future.

To document what ostensibly happened during these fictional treatment sessions, the clinic's social workers would manufacture fake progress notes via a creative-writing exercise held each day in the clinic's conference room.  As time went by, the clinic streamlined operations by allowing social workers to perform this work from home.  A stack of blank progress notes would arrive at a social worker's house; the social worker would fill in the blanks; and other employees at the clinic would stamp the completed notes with the appropriate dates.

For example, one social worker, Felicia Marsh, wrote the following progress note to describe what happened during a session she purportedly conducted with a patient named Lorraine Lee:

> [Lee is] alert and oriented times three . . . No presenting concerns. [Lee is] alert, well-dressed and well-groomed. Worker and [Lee] discussed her childhood and onset of mental health issues. [Lee] states that she has been depressed since the age of 10.

On another occasion, Marsh wrote this note about a session she purportedly conducted with a patient named Stephon Heller:

> [Heller] and this worker met for an individual session. [Heller was] alert and oriented times three. [We] discussed his faith and spirituality and the role it plays in his life.

Nothing in these notes was true, of course. Marsh had provided no therapy at all to Lee, Heller, or any other patient; and thus she knew nothing about Lee's grooming habits or Heller's spiritual life. The contents of these two notes—and countless like them—were, as Marsh put it, "just made up." The social workers would just write "whatever [they] felt like," or just "pick[] it out of the air. Just pick[] it." The clinic's staff then used the binder and the Potemkin progress notes to bill Medicare for some $3 million in treatments that the clinic never provided.

But the perpetrators of this scheme were careless in covering their tracks. The clinic billed Medicare for psychotherapy sessions supposedly conducted on holidays when the clinic was closed. The clinic billed for group therapy sessions involving 30-35 patients at a time, despite Medicare rules that permitted only 12 patients per session. On several occasions, one of the social workers billed full-time at the clinic while working full-time at another hospital 70 miles away. On other occasions, a single social worker billed Medicare for more than 24 hours' of psychotherapy that he purportedly provided in a single day.

The FBI eventually caught on and raided the clinic in April 2012. Several of the clinic's employees were ultimately indicted, including its CEO, Glenn English, and its Programs Director, Richard Hogan. After a six-day trial, a jury convicted English of Medicare fraud, in violation of 18 U.S.C. §§ 2 and 1347, and convicted English and Hogan of conspiracy to commit

Medicare fraud, in violation of 18 U.S.C. §§ 1347 and 1349. The district court sentenced English to 96 months in prison, Hogan to 60 months. This appeal followed.

II.

A.

English argues that the district court erred by allowing the government to offer evidence that he had previously been involved in two other Medicare-fraud schemes. We review for an abuse of discretion the district court's decision to admit that evidence. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997). The government may not use evidence of prior bad acts to show that a defendant's character made him more likely to commit the charged crime. Fed. R. Evid. 404(b). But the government may offer such evidence to show, among other things, "intent[,] knowledge[,] [or] absence of mistake." *Id.*

Here, the government needed to prove that English had defrauded Medicare "knowingly and willfully." 18 U.S.C. § 1347. Evidence that English had been involved in prior Medicare fraud schemes—and was thus aware of how such schemes operated—showed that he had knowingly and willfully defrauded Medicare and had not done so by mistake. *See United States v. De Oleo*, 697 F.3d 338, 343-44 (6th Cir. 2012). Hence that evidence was admissible.

English responds that the prejudicial effect of that evidence outweighed any probative value. But whether English had defrauded Medicare innocently or intentionally was a central issue—if not the central issue—of the case. Evidence that shed light on his true intentions was thus highly probative. And the district court mitigated any potential prejudice by giving the jury a detailed limiting instruction. R. 139 at 1374-75. The district court did not abuse its discretion, therefore, by holding that the probative value of the evidence outweighed any prejudicial effect.

We also note that this evidence did not "materially affect[] the verdict." *United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008). In addition to the evidence that English had been involved in past Medicare-fraud schemes, the government also presented a Matterhorn of evidence that English had masterminded this particular scheme as well: *e.g.*, that English founded New Century and enrolled the clinic as a Medicare provider, that English required the clinic's patients to sign their names in the binder for days when they did not visit the clinic, that

English hand-delivered stacks of blank progress notes to his staff, that English ordered his staff to fill in those blank notes with fake content, that English used his provider-identification number to bill Medicare for treatment that the clinic never provided, and that the proceeds from the clinic's billings went into English's own bank account. Given that amount of incriminating evidence, the evidence that English had been involved in other fraud schemes did not materially affect the verdict. Thus, the district court's decision to admit that evidence was, at worst, harmless error.

B.

As for Hogan, he first argues that the evidence was insufficient to support the jury's verdict. He failed to make that argument at the end of trial, however, so we affirm unless "the record is devoid of evidence pointing to guilt." *United States v. Frazier*, 595 F.3d 304, 306 (6th Cir. 2010). To convict Hogan of conspiracy to commit Medicare fraud, the government needed to prove that Hogan knowingly and voluntarily joined the conspiracy via an explicit agreement or a "tacit or mutual understanding." *United States v. White*, 492 F.3d 380, 395 (6th Cir. 2007).

Here, the government presented evidence that Hogan was the third-ranking officer at the clinic; that he recruited many of the clinic's patients with promises of drugs; that he instructed patients that they needed to sign up for psychotherapy treatments if they wanted those drugs; that he diagnosed patients with mental-health disorders though they had none; that he directed the clinic's doctor to prescribe Vicodin, Xanax, and similar drugs to patients; that he assisted employees in creating fake progress notes; that he created such notes himself; and that he admitted to the FBI that he knew the clinic had billed Medicare for treatments never provided. The record is hardly "devoid of evidence" that Hogan knowingly and voluntarily joined the conspiracy to commit Medicare fraud. So this argument fails.

Hogan responds that there was a variance between the indictment and proof at trial. Specifically, he says that the government charged that he conspired to commit Medicare fraud but also presented evidence that he conspired to distribute drugs. Even if one grants the premise of Hogan's argument, however, a variance is not reversible error unless it affected a defendant's substantial rights. *United States v. Robinson*, 547 F.3d 632, 642 (6th Cir. 2008). And Hogan nowhere explains how this alleged variance did so. Moreover, if the government proves that the

defendant was involved in the charged conspiracy, then "clearly there is no variance affecting [the] defendant's substantial rights." *Id*. at 642-43. The indictment charged Hogan with conspiracy to commit Medicare fraud. As shown above, the government proved that Hogan was involved in that conspiracy. So this argument fails.

Hogan also argues that the district court erred by admitting two statements that he says were hearsay: a patient's statement that Hogan gave the patient a loan with which to buy prescription drugs, and a clinic employee's statement that patients needed to "sign in and do some activities" if they wanted pills. Even if the district court should have excluded those statements, however, the error was harmless so long as we can "say with fair assurance" that the statements did not "substantially sway[]" the jury's verdict. *Griffin v. Finkbeiner*, 689 F.3d 584, 599 (6th Cir. 2012). We have no difficulty saying that here. Given the other evidence against Hogan that the government presented—*see supra*—these two additional statements in no way tipped the scales against him.

We affirm.

---

**CONCURRENCE**

---

CLAY, Circuit Judge, concurring. I concur in the holding that the district court's judgment should be affirmed as to both defendants. However, because the testimony about English's involvement in prior fraudulent schemes should not have been admitted, I would affirm his conviction on the basis of harmless error only.

Federal Rule of Evidence 404(b) prohibits admitting evidence of a person's prior wrongful acts for propensity purposes, that is, "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Under 404(b)(2), evidence of prior bad acts may be admitted for certain permissible purposes including, as relevant here, intent. Fed. R. Ev. 404(b)(2); *United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994) ("[W]here the crime charged is one requiring specific intent, the prosecutor may use 404(b) evidence to prove that the defendant acted with the specific intent."). A district court must apply a three-step analysis to determine the admissibility of 404(b) evidence:

> First, the court must find, based on sufficient evidence, that the other act in question actually occurred. The court next decides whether the evidence is probative of a material issue other than character. Finally, the court determines whether any unfair prejudice generated by the other act evidence is substantially outweighed by its probative value.

*United States v. Mack*, 729 F.3d 594, 601 (6th Cir. 2013) (citations omitted). We review the district court's factual findings for clear error, its conclusions of law *de novo*, and its determination that the probative value of the contested evidence substantially outweighs the danger of unfair prejudice for abuse of discretion. *Id.*

On appeal, English challenges testimony offered by two different witnesses, Felicia Marsh and Atul Patel, about two different prior fraudulent schemes. Felicia Marsh, a New Century employee, described falsifying treatment records at English's direction years earlier at a different clinic. This evidence was arguably probative of intent because it demonstrated reliance on the same *modus operandi*. *See United States v. De Oleo*, 697 F.3d 338, 343 (6th Cir. 2012) (holding that evidence that the defendant had previously relied on the same employee to fabricate

medical charts at another clinic was probative of intent at later clinic where the employee fabricated medical charts in the same way).  However, probative value in the context of 404(b) evidence "is not an absolute; its value must be determined with regard to the extent to which the [material issue] is established by other evidence, stipulation or inference."  *United States v. Roberts*, 2015 WL 831908, *9 (6th Cir. 2015) (citation and quotation marks omitted).  In light of the extensive evidence tending to show English's fraudulent intent, including Marsh's testimony that she was directed to falsify records at New Century, the "incremental probative value" of her testimony about the prior clinic was next to nonexistent.  *See id.*  At the same time, evidence that a defendant has committed the same crime on an earlier occasion has an undoubtedly prejudicial effect.  *Johnson*, 27 F.3d at 1193.  In light of the obvious imbalance between the negligible probative value of Marsh's testimony about fraud at a prior clinic, and the unavoidably prejudicial effect of suggesting to the jurors that English had a propensity for fraud, the decision to allow the testimony was an abuse of discretion.

The second witness, Atul Patel, described seeing English sell patient referrals for cash to a man named Vinod Patel (no relation), who was then running a scheme that entailed charging Medicare for home health services that were neither needed nor provided.  Significantly, after selling patient referrals to Vinod on at least two occasions, English approached the Patels for support in setting up his own operation, and with Vinod's support went on to create New Century.  Atul testified that Vinod gave English a loan to start the company and allowed him to take over an existing scheme selling prescription drugs to Medicare beneficiaries in Flint, complete with an existing doctor willing to issue the prescriptions and an established customer base. On appeal, English appears only to challenge the portion of this testimony that described him selling referrals to Patel for the distinct fraudulent scheme related to home health care.  The government does not articulate how the referral sales are probative of English's knowledge or intent—leaving us only with the forbidden inference that because English participated in health care fraud "in the past, it is likely that he was doing so in the present case."  *United States v. Bell*, 516 F.3d 432, 445 (6th Cir. 2008).  Because the testimony about the sales was not probative of knowledge or intent except through the forbidden inference of propensity, the district court erred in allowing it to come in.

The majority briefly suggests that testimony that English had been involved in prior Medicare fraud schemes was probative of knowledge because it was evidence that he was "aware of how such schemes operated." Maj. Op. at 4. While prior bad acts evidence may sometimes come in to prove knowledge under Rule 404(b), admissibility under this rationale is subject to a threshold inquiry of whether knowledge is a material issue in the case. *Johnson*, 27 F.3d at 1191 ("[B]efore 404(b) evidence may be admitted as probative of the defendant's intent, intent must be a material issue in the case."). English's knowledge of how Medicare fraud schemes generally work was not a material issue in this case, so the evidence was not admissible on that basis.

The government attempts to argue that the challenged testimony was admissible because it was background evidence "inextricably intertwined" with the evidence of English's criminal conduct related to New Century, invoking the "intrinsic evidence" exception to 404(b). *See United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011) ("Where the challenged evidence is 'intrinsic' to, or 'inextricably intertwined' with evidence of, the crime charged, Rule 404(b) is not applicable." (quotation marks omitted)). That exception covers acts that are "part of a single criminal episode," or are otherwise integral to the testimony establishing the criminal conduct. *United States v. Adams*, 722 F.3d 788, 822 (6th Cir. 2013) (quotation marks omitted). Plainly, neither Marsh's testimony about fraud at the prior clinic nor Atul Patel's testimony about English's referral sales meets this test. These were discrete instances of fraudulent conduct constituting only gratuitous evidence of English's propensity to commit fraud.

Although the testimony was inappropriate, in this case it is safe to say that it was harmless. Both witnesses gave extensive first-hand testimony about English's actions and intent at New Century, establishing in no uncertain terms that the clinic was founded, designed, and administered in order to perpetrate an illegal scheme of trading drug prescriptions for the opportunity to fraudulently bill Medicare for treatment that was never provided. Therefore, I agree that English's conviction should be affirmed.